**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 04-10231-MLW** |
| | ) | |
| **PETER MAGGIO, et al,** | ) | |
| _____ | ) | |

**DEFENDANT LOUIS A. PARADISO'S SENTENCING MEMORANDUM**

---

Defendant, Louis A. Paradiso (hereinafter "Paradiso"), submits this memorandum, by and through counsel, to address the issues that will be raised during the sentencing phase of his case. For the reasons set forth herein, Paradiso submits that a sentence of probation for three (3) years with any additional conditions deemed necessary by the Court, is sufficient but not greater than necessary to achieve the statutory purposes of sentencing set forth in § 3553(a)(2).

I.    HISTORY AND CHARACTERISTICS OF MR. PARADISO.

A.    Paradiso's Childhood.

Louis A. Paradiso, age 33, is the only child born to the union of Angelo Fenno and Rose Paradiso.  At the time of his birth, Paradiso's parents were married.  However, their marriage was annulled shortly thereafter.  After his parents separated, Paradiso and his mother moved into her brother's house, where Paradiso was raised by his mother, his uncle, Peter Sacco, and his grandmother.  However, Paradiso has remained close to his father throughout his life.

Paradiso lived with his mother and uncle until he was twenty-seven (27) years old. Paradiso was still living with his mother and uncle when he became involved with Peter Maggio.

Paradiso's  childhood was quite sheltered.  Indeed, his uncle, Peter Sacco, is a very religious man who imposed his religious beliefs upon Paradiso and required him to live a simple,

faith-based life that included daily prayers and regular attendance at religious services. Paradiso also was prohibited from watching television growing up because his uncle would not allow a television in his house. Paradiso was raised in a stable environment. However, his sheltered upbringing made him an easy target for Peter Maggio (hereinafter "Maggio").

B.    Educational History.

Paradiso does not have the intellect to excel in academics. Indeed, while in elementary school, he had to repeat sixth grade. His explanation for this educational setback is that he was never any good in English. Specifically, he states that he has always had trouble comprehending what he was reading and remembering words. As a result, his vocabulary is quite limited. However, he does not recall being tested for any learning disabilities.

Moreover, as noted in the PSR, during his high school years he studied to be an auto mechanic and he received primarily "poor" grades. Indeed, he did not graduate from the Everett Vocational High School until he was four months shy of his twentieth (20th) birthday. It is likely that Paradiso's limited intellect made him particularly vulnerable to Maggio's manipulative behavior.

C.    Exceptional Employment History.

Paradiso began working as a mechanic shortly after graduating from high school in 1991. Indeed, Paradiso's employment history has been quite exceptional. Except for one period of unemployment from 1999 until July 2000, Paradiso has been gainfully employed during the past fifteen (15) years whenever he has been physically able to work.

In fact, prior to his graduation from high school, Paradiso was employed part-time at his first job at Premium Lube and Wash from 1998 until June, 1991. After graduating in June, 1991, he continued to work at Premium Lube and Wash in a full-time capacity until October 1992.

From October 1992 until 1996, he was employed as a mechanic at Century Ford. From 1996 until April 1998, he was employed as a mechanic at Ocean Ford. From April 1998 until July 1998, he was employed at Atlantic Ford until he was injured on the job when he fell and injured his back. After his back injury, he collected worker's compensation for approximately 6 months, and was then terminated in December 1998. Not surprisingly, it was during the period that he was collecting worker's compensation and was subsequently terminated that he became involved with Maggio. Also, it was during his relationship with Maggio, that he experienced the only period of unemployment when he was physically able to work. However, after parting ways with Maggio, Paradiso continued his exceptional work history.

From July 17, 2000 until February 2001, Paradiso worked as a mechanic for Natick Ford. From February 2001 until July 17, 2003, Paradiso worked as a mechanic at 128 Ford. However, on July 17, 2003, Paradiso sustained a life-altering injury when a hydraulic lift fell on him and crushed his left foot. As a result of this injury, Paradiso was totally disabled and unable to work from July 2003 until August 2004 because he could not stand on his feet long enough to perform the duties of a mechanic. After he settled his worker's compensation claim, he was laid off again even though he was not fully recovered. As a result, he collected unemployment until he was fully recovered and able to return to work in April 2005, when he started working as a mechanic for Copeland Toyota. Paradiso worked at Copeland Toyota until March 16, 2006, when he fractured his left foot on the job and re-aggravated his prior injury. At present, he is collecting worker's compensation benefits because he is still partially disabled.

Thus, the only period that Paradiso was able to work and unemployed since graduating from high school was the period he was involved with Maggio from 1999 through July 2000. Except for this brief period, Paradiso has maintained steady employment since before he

graduated from high school.  In addition, each period of unemployment he sustained was preceded by a work-related injury.  In sum, Paradiso's 15-year employment history has been exceptional and his employment as a mechanic is atypical of financial crimes.

        D.      <u>Medical History</u>.

As verified in the PSR (<u>see</u> ¶ 249), Paradiso has a condition called Complex Regional Pain Syndrome ("CRPS"), also known as Reflex Sympathetic Dystrophy Syndrome ("RSD"). CRPS is a chronic pain condition that is believed to be the result of dysfunction in the central or peripheral nervous systems. Typical features include dramatic changes in the color and temperature of the skin over the affected limb or body part, accompanied by intense burning pain, skin sensitivity, sweating, and swelling.  The key symptom of CRPS is continuous, intense pain out of proportion to the severity of the injury (if an injury has occurred), which gets worse rather than better over time. CRPS most often affects one of the extremities (arms, legs, hands, or feet) and is often accompanied by "burning" pain; increased skin sensitivity; changes in skin temperature; changes in skin color; changes in skin texture; changes in nail and hair growth patterns; swelling and stiffness in affected joints; and decreased motor disability.  Often the pain spreads to include the entire leg, even though the initiating injury might have been only a foot. Pain can sometimes even travel to the opposite extremity. It may be heightened by emotional stress.  <u>See</u> *Complex Regional Pain Syndrome Fact Sheet*, at National Institute of Neurological Disorders and Stroke website, available at <u>http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm</u>.

Since July 2003, Paradiso has been afflicted with this painful condition.  After injuring the same foot in March 2006, he now needs a cane to walk.  In addition, he cannot run, lift heavy

weights or stand for a long period of time. Moreover, he is on a number of prescription medications that help manage the daily chronic pain he experiences including MS Contin, Percocet, Neurontin and Tramadol. This injury left him totally disabled for more than a year from July 2003 through August 2004 and prevented him from returning to work until April 2005. This chronic condition will afflict Paradiso for the rest of his life. This condition also may make him vulnerable if he is incarcerated.

      E.    <u>Father's Serious Medical Condition</u>.

Paradiso's father, Angelo Fenno, who is eighty-one (81) years old, was recently hospitalized for cholecystitis. Cholecystitis is an inflammation of the gallbladder wall and nearby abdominal lining caused by a gallstone in the cystic duct.

Shortly after he was discharged, he was re-admitted with severe pancreatitis, or inflammation of the pancreas, which was complicated by pancreatic failure including new onset diabetes. As a result of these complications, he had a prolonged hospital stay but, was recently discharged home.

According to Mr. Fenno's cardiologist, Lawrence J. Moschitto, M.D., Mr. Fenno requires daily insulin injections and blood sugar monitoring at home. Also, he is on a restrictive diet and takes a number of medications. <u>See</u> Letter from Dr. Moschitto attached hereto as Exhibit A. Dr. Moschitto has opined that it is in Mr. Fenno's best interest to live with his son so Paradiso can help his father manage his diabetes, diet and medications. According to Dr. Moschitto, it is clearly safer for Mr. Fenno to live with his son.

Since Mr. Fenno has been discharged from the hospital, Paradiso has been visiting with him almost every day and has been helping his father manage his health issues. Paradiso is also

looking to purchase a larger home so his father can move in with him and his family. Until he purchases a new home, Paradiso will continue to visit with his father as often as necessary.

II.    NATURE AND CIRCUMSTANCES OF MR. PARADISO'S OFFENSE.

On June 15, 2006, Paradiso entered a plea of guilty to Counts One through Five of the Indictment in the above-captioned matter. Count One charged him with a conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. § 371. Counts Two and Three charged Paradiso with aiding and abetting wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2. Counts Four and Five charged him with aiding and abetting mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.

Prior to entering his plea of guilty in this case, the parties agreed that at the time of his plea, the parties would enter a stipulation as to the net losses attributable to him. Specifically, the parties' stipulation consisted of two facts: one explicit and one implicit. First, the parties expressly stipulated that, for purposes of calculating the advisory guideline sentence, the net losses attributable to Paradiso totaled $1,792,849.01. Second, the parties implicitly stipulated that Paradiso actively participated in the loans resulting in said net losses. However, the parties did not stipulate to any additional facts.

To fully appreciate Paradiso's limited role in the conspiracy set forth in the Indictment and the PSR, it is important for the Court to know what Paradiso knew and, more importantly, did not know during the course of the conspiracy. Moreover, when considering the relative culpability of the defendants in this case, it is important to keep in mind that Paradiso's limited intellect and naiveté likely contributed to his involvement in this conspiracy. Finally, and most importantly, Paradiso notes that he, like so many others, was victimized by Peter Maggio in this case.

A.    <u>Defendant's Version Of The Offense</u>.

Sometime in late 1997, Paradiso was introduced to Peter Maggio (hereinafter "Maggio") by a Mark Ferullo (hereinafter "Ferullo").  Paradiso had previously worked with Ferullo at Century Ford and considered him a friend.  Ferullo introduced Maggio to Paradiso as his friend.

In or around July 1998, Peter Maggio asked Paradiso if he wanted to start a construction business together.  Paradiso, who had recently injured his back and was out of work, told Maggio that he knew nothing about the construction business and asked Maggio to explain what he had in mind.  Maggio explained that because he had credit problems he could not start a business on his own.  However, if Paradiso allowed the business to use his credit, then they could both realize a profit from the business when the business was successful.

Maggio further explained that he would need Paradiso's name and social security number to get the business started and to obtain leases on trucks that Maggio would use to do the company's business.  Maggio also told Paradiso that Paradiso would be the president of the company, which later turned out to be Earth Management & Equipment Company, Inc (hereinafter "Earth"), but that Maggio would run the company.

Maggio also told Paradiso that he would be paid for being the president.  Initially, Maggio told Paradiso that he would be paid $100 for every truck that Paradiso helped Maggio put into service, but only after each truck was earning money for their business.  In addition, Maggio offered to help Paradiso pay down his credit card debt.  Unbeknownst to Paradiso, it was in Maggio's interest to eliminate Paradiso's credit card debt because it would improve Paradiso's creditworthiness.

Thereafter, Maggio introduced Paradiso to Barry Rubin.  Paradiso understood that Rubin was working with Maggio to get the business up and running.  Rubin presented Paradiso with a

7

number of applications that he signed. Rubin told Paradiso he would take care of everything else.

When compared to Maggio, Deveau, Howe and O'Neill's conduct, Paradiso's role in the conspiracy was quite limited. Specifically, on a number of occasions in between December 1998 and October 1999, Maggio asked Paradiso to drive to Maine and meet with Jerry Tradeup at O'Connor GMC. Each time Paradiso traveled to Maine to meet with Tradeup, he was asked to sign documents in his capacity as president of Earth. Paradiso understood that the documents he was signing were documents that had to be signed for Earth to purchase or lease trucks and equipment. However, Paradiso did not read the documents and did not fully understand the obligations he was undertaking.

Generally speaking, Paradiso would sign the papers because Maggio told him they needed to be signed. Moreover, Paradiso understood that after the trucks and equipment were delivered, Maggio would take control of the trucks and place the trucks into service because he (Paradiso) knew nothing about running a business. Like so many others before and after him, Paradiso trusted Maggio and believed Maggio to be a man of his word.

Paradiso was also aware that a business bank account had been set up for Earth at Century Bank. Paradiso was also aware that Century closed the account because checks were being returned for insufficient funds. Maggio told Paradiso he would take care of it and Paradiso believed him. Thereafter, a bank account at Eastern Bank was opened for Earth.

Initially, Maggio asked Paradiso to sign blank business checks as president of Earth. Paradiso understood that Maggio would fill in the actual amounts at a later date. Eventually, Paradiso stopped signing checks and, thereafter, either Maggio or someone else forged Paradiso's signature on Earth's business checks.

Similarly, in 1998 and 1999, Paradiso voluntarily signed the financing and related documents he was instructed to sign.  However, like the business checking account, eventually, either Maggio or someone else, started forging Paradiso's signature on loan documents and submitting copies of documents Paradiso previously signed to obtain new loans.

Paradiso also flew to Syracuse, New York on two occasions.  Each time he met with an individual with gray hair and glasses at the airport.  This gray-haired individual handed Paradiso a Federal Express package and, in exchange, Paradiso gave him an envelope.  After taking possession of the FedEx package, Paradiso flew back to Boston on the next available plane.  On one occasion, Paradiso looked into the FedEx package and saw a copy of a title.  He never looked inside the envelope he delivered to the gray-haired man.

Also, Maggio asked Paradiso if he knew of any other individuals who might be interested in going into business with him (Maggio).  As a result, Paradiso asked his cousin, Sean Sacco and a friend, Matt Havey, if they were interested and subsequently Paradiso introduced them to Maggio.  However, Paradiso's role was limited to introducing Sacco and Havey to Maggio.  At no time did he manage or otherwise supervise or control their activities.

Maggio never actually paid Paradiso $100 for each truck put in service even though Paradiso incurred over $3 million in debt.  However, the fact that Paradiso agreed to sign loans obligating him to pay hundreds of thousands of dollars in exchange for $100 per truck is further evidence of his naiveté.  If Maggio had paid Paradiso as agreed, Paradiso would have received a whopping $1,300.00 for his efforts.  While Paradiso received more, the fact that he agreed to place himself at risk for such a small amount gives context to his business acumen.

However, Maggio did not pay Paradiso $100 per truck.  Rather, he give Paradiso money to pay down his credit card debt and, for a period in 1999, Paradiso was paid approximately $700

per week in cash, but on an inconsistent basis.  Paradiso estimates that during the course of the conspiracy alleged in this case, Maggio paid him approximately $37,000 or approximately two-thousandths percent (.002%) of the total net losses ($15,731,860.33) in this case.

More importantly, Paradiso did not know that false financial statements and false personal and corporate tax returns were being submitted to the lending institutions on his behalf until he reviewed the discovery in this case.  Indeed, Paradiso believes that Maggio deliberately concealed these facts from him.  It is also likely that many of the loans in this case would not have been approved if these false financial statements and false personal and corporate tax returns were not submitted during the loan application process.  Finally, Paradiso was not aware of other aspects of the conspiracy including the multiple financings of vehicles.

The conspiracy in this case and Paradiso's role in it reminds me a little of the story of the four sons contained in the Haggadah that is read each year during Passover.  The Haggadah speaks of "four sons"—one who is wise, one who is wicked, one who is simple, and one who does not have the capacity to inquire.  Each of the sons' question, "What is the meaning of this service?" is answered in different ways.

Similarly, the answer to the question "What is the purpose of this conspiracy?" in this case can be answered in different ways depending on who is asking the question.  For Maggio, who is akin to the wicked son, the answer would include all the details of the conspiracy. However, for Paradiso, who is akin to the simple son with respect to certain aspects of this conspiracy and the son who does not have the capacity to inquire with respect to other aspects of the conspiracy, the answer would be quite different.  In short, Paradiso's limited knowledge and understanding of the purpose and scope of the conspiracy is a mitigating factor that the Court should weigh when sentencing him.

B.      Collateral Consequences Of The Offense.

Paradiso also notes that he has experienced collateral consequences as a result of his conduct in this case. First, because of the large amount of debt he incurred in this case, he was forced to file Chapter 7 bankruptcy petition on January 29, 2001. On December 4, 2001, he was granted a discharge. See Discharge Order attached hereto as Exhibit B.

In addition, as Earth's president, the Commonwealth of Massachusetts determined Paradiso to be the responsible person for the corporation's tax liability. Paradiso has paid Earth's tax liability of $19,507.54 in full and, recently, the Massachusetts tax lien was released. See Release of Massachusetts Tax Lien attached hereto as Exhibit C.

III.    PRESENTENCE REPORT ADVISORY GUIDELINE CALCULATION.

Defendant disputes the calculation of the Total Offense Level contained in the PSR and submits that his Total Offense Level should be a Level 14.

1.      The Stipulated Net Loss Amount.

In the PSR, the Probation Office asserts the position that the total net loss should include 14 loans totaling $1,875,363.15 instead of the 13 loans stipulated between the parties totaling $1,792,849.01. Paradiso objects to the amount contained in the PSR, but notes that it does not impact the Offense Level computation because both amounts result in a 12-level increase.

However, to the extent the Court makes a finding on this issue, Paradiso submits that the higher amount should not be included for two reasons. First, the additional loan is not included in the joint stipulation entered in this case because the government concedes that it cannot prove by a preponderance of the evidence that defendant directly participated in these loans because there is "no documentation either showing PARADISO'S signature or because the purported

signature is not genuine."   Second, the government cannot prove that defendant was aware of these transactions.

Similarly, the additional loans referenced in paragraphs 137, 139, 141, 149, 159, 163, and 173 of the PSR should also be deleted for the same reasons.  These loans also should be excluded because they are not relevant conduct with respect to Paradiso.   Specifically, forged loan documents was not a reasonably foreseeable act or omission of others in furtherance of the jointly undertaken criminal activity in this case because the jointly undertaken criminal activity was the use of straw borrowers.  See  U.S.S.G. § 1B1.3(a)(1)(B).  Forging loan documents is inconsistent with this scheme.  Indeed, forging loan documents would make the straw borrowers unnecessary.  Thus, while all the loans contained in the PSR may be relevant conduct as to Peter Maggio, they are not relevant conduct as to Paradiso.  Therefore, defendant submits that it is inaccurate to characterize these transactions as sales to Paradiso when there is no evidence to support the contentions that he actively participated in or, was aware of, said transactions.  Accordingly, they should be deleted.

       2.    <u>Sophisticated Means</u>.

Paradiso further objects to the 2-level increase, pursuant to U.S.S.G. § 2F1.1(b)(5), for "sophisticated means."   While it is true that Maggio, O'Neill, Deveau and Howe's conduct involved more than minimal planning, the government has not proven and cannot prove that Paradiso was aware of their sophisticated conduct.  See U.S.S.G. § 2F1.1, Application Note 15 (enhancement requires conduct that is significantly more complex than the conduct that forms the basis for an enhancement for more than minimal planning).  In addition, defendant's role in the offense as a straw borrower was not "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."  Id.

In addition, given Maggio's long and successful history of manipulating others for personal gain, including the government and AUSA Wild, in particular, the courts and the numerous individuals and banking institutions set forth in his prior convictions, it would be particularly unjust to apply a "sophisticated means" enhancement to Paradiso's conduct in this case. See United States v. Maggio, Criminal No. 99-10333-MLW (where Maggio manipulated Constance Cirino, Senior Vice President of the Everett Savings bank to obstruct an FDIC examination and convinced the Court to sentence him to 36 months of probation); United States v. Maggio, Criminal No. 01-10386-RWZ (where Maggio and Dennis Ferullo obtained fraudulent loans totaling $2.8 million to finance the purchase of 85 automobiles through the use of straw borrowers and false financial documents and received a 51-month sentence); United States v. Maggio, Criminal No. 02-10280-WGY (where Maggio and Patrick Dandrea obtained fraudulent loans totally $168,760 to finance the purported purchases of construction equipment through the use of false documents, when in truth and fact, the purchases never occurred; Maggio received a 24-month sentence to run concurrent with the sentence in 01-10386-RWZ).

     3.     Paradiso's Role In The Offense.

          a.     Paradiso Was Not A Manager Or Supervisor.

Paradiso objects to the 3-level increase, pursuant to U.S.S.G. § 3B1.1(b) contained in the PSR. Specifically, Probation assets that because Paradiso "recruited other 'straw' buyers", he should be classified as a manager or supervisor. However, this conclusion is not supported by the facts in this case. Moreover, Paradiso submits that he should receive a decrease of at least 3 levels for his relatively minor, if not minimal, role in the offenses in this case.

Managerial status under U.S.S.G. § 3B1.1(b) only attaches if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for

13

overseeing the activities of at least one other person.  See United States v. Cali, 87 F.3d 571, 578 (1st Cir. 1996).  Of the factors that the courts have looked at only one is applicable in this case: recruitment of accomplices.  However, no one factor is dispositive.  Moreover, there has been no evidence submitted that proves that Paradiso exercised control over Havey and Sacco or was otherwise responsible for overseeing their activities.  Accordingly, a 3-level role enhancement is not appropriate in this case.

Moreover, the other factors that the courts consider in this context further support the conclusion that a role enhancement is not warranted.  See U.S.S.G. § 3B1.1(b), Application Note 4; United States v. Fuller, 897 F.2d 1217, 1220-21.  Paradiso's participation in the commission of the offense was minor or minimal.  Indeed, defendant's conduct alone would not have been sufficient to obtain any loans.  Moreover, additional information such as false tax returns and financial statements had to be provided by others to induce the financial institutions to approve the loans.

Also, Paradiso did not claim any right to a larger share of the fruits of the crime.  Rather, Paradiso received approximately two-thousandths percent (.002%) of the loan proceeds. Paradiso did not participate in the planning or organizing of the crime.  Paradiso was unaware of the roles played by Deveau, O'Neill, and Howe in the offense and did not know the full extent of Maggio's criminal conduct.  Moreover, Paradiso involved Havey and Sacco because Maggio asked him to find other people willing to go into business.  In short, where Paradiso did not exercise any control or otherwise supervise anyone, the record does not support a 3-level manager or supervisor enhancement.

14

b.    <u>Paradiso's Role Was Greater Than Minimal But Less Than Minor</u>.

A closer look at Paradiso's actual role indicates that he should receive a 3-level decrease in his offense level pursuant to U.S.S.G. § 3B1.2 for his greater than minimal but less than minor role.  Indeed, when comparing Paradiso's role in the offense (signing documents as a straw borrower) to Maggio (the kingpin and mastermind), O'Neill (the finance executive), Deveau (heavy duty equipment dealer) and Howe (accountant and drafter of bogus financial documents and tax returns), two conclusions are readily apparent.  First, the documents Paradiso signed were not sufficient to obtain any loans.  Second, no loans would have been approved without the participation of Maggio, O'Neill, Deveau and Howe.  In addition, the government does not dispute that Paradiso was unaware of the most critical aspects of this conspiracy (i.e., false financial records, false tax returns, and multiple financings of same vehicle).  Indeed, Paradiso was in many ways a victim of Maggio's scam.  Paradiso, who has no prior record, was forced to file for bankruptcy, forced to pay back taxes and is now facing jail time because he was scammed by Maggio.  Under these circumstances, Paradiso submits that he should receive a 3-level decrease based on his role in this case.

Accordingly, Paradiso submits that his Total Offense Level should be 14 and, because he qualifies for Criminal History Category I, his advisory guideline range should be 15-21 months.

IV.    A THREE-YEAR SENTENCE OF PROBATION IS MORE THAN SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE THE FEDERAL SENTENCING PURPOSES SET FORTH IN 18 U.S.C. § 3553.

In the Sentencing Reform Act of 1984, Congress directed the Sentencing Commission to assure that the purposes of sentencing set forth in 28 U.S.C. § 3553(a)(2) (just punishment, deterrence, incapacitation, and rehabilitation) were met.  After <u>Booker</u>, pursuant to § 3553(a), judges must impose sentences sufficient but not greater than necessary to achieve the statutory

purposes of sentencing.  Paradiso submits that a three-year sentence of probation is both a reasonable and defensible overall result under the circumstances of this case.  Cf.  United States v. Thurston, 456 F.3d 211, 215 (1st Cir. 2006)

> A.    A Three-Year Sentence Of Probation Is Sufficient To Serve The Purposes Of Sentencing When Sentencing A First Offender.

The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal record.  This philosophy, which can be derived directly from the guidelines Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to reoffend.    As such, they are deserving of reduced punishment.

Through 28 U.S.C. § 994(j), Congress incorporated the "first offender" philosophy into statutory law and the sentencing guidelines when it directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…."

In 2004, the Commission reported that in fiscal year 1992, more than 49% of federal offenders were first offenders; in fiscal year 2001, the more than 40% (42.2%) of federal offenders were first offenders.  See Recidivism and the First Offender at 4 (May 2004) (hereinafter          "First          Offender")          available          at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf.    As a group, first offenders are more likely to be involved in less dangerous offenses and their offenses involve fewer indicia of culpability, such as the use of violence or weapon, no bodily injury and acceptance of responsibility.  Id.  9-10.    They are also more likely than offenders with criminal histories to have a high school diploma and to be employed.  Id. at 6-11.  Most importantly, research has

found that offenders are most likely to recidivate when their sentence is straight prison time, as opposed to probation or split sentences.    See *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines* at 13 & Exhibit 12 (May 2004) available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

However "first offender" status is defined[1], the rate of recidivism (including reconviction, rearrest or revocation) for first offenders is 11.7%, which is significantly lower that the rate of 22.6% for offenders with one criminal history point, or that of 36.5% for offenders with two or more criminal history points. *First Offender,* supra at 13-14.  Even more interesting, the rate of reconviction also is much lower.  Indeed, offenders with zero criminal history points have a reconviction rate of 3.5%, those with one point have a reconviction rate of 5.5% and offenders with two or more points have a reconviction rate of 10.3.  Id. at 13-14, n. 25, 26 & 27.

Thus, Paradiso's first offender status makes it likely that his rate of recidivism is very low.  Moreover, other factors such as his age at the time of sentencing, sustained employment, his compliance with the conditions of this pretrial release further demonstrate that a prison sentence is unnecessary to serve the purposes of sentencing in this case.    Indeed, the Commission's own research has found that the lengthy sentence will only increase the likelihood of his recidivism which clearly is counterproductive. *See Measuring Recidivism*, supra at 13 & Exhibit 12.  Accordingly, where Paradiso is a first offender, a 3-year sentence of probation is sufficient to achieve the purposes of sentencing.

---

[1] Whether the status "first offender" is defined as individuals with a zero criminal history points, individuals with a Criminal History Category I, or individuals with no prior convictions, Paradiso qualifies as a first offender.

V.    A DEPARTURE AND/OR VARIANCE IS NECESSARY TO SERVE THE FEDERAL
      SENTENCING PURPOSES SET FORTH IN 18 U.S.C. § 3553.

18 U.S.C. § 3582 instructs the Court to "consider the factors set forth in section 3553(a)
to the extent they are applicable, *recognizing that imprisonment is not an appropriate means of
promoting correction and rehabilitation.*" (Emphasis added). In determining the proper sentence
in this case, it is also important to note that "the starting point for every sentence should be
probation or some other sentence not involving commitment or confinement." *American Bar
Association Project on Minimum Standard for Criminal Justice, Sentencing Alternatives and
Procedures*, (Approved Draft, 1968), Section 2.3(e), pp. 72-73. However, under the advisory
guidelines, Paradiso is not eligible for probation unless this Court departs downward. *See*
U.S.S.G. § 5B1.1.

In this case, there are a number of exceptional reasons why the Court should either depart
under the advisory guidelines or, after considering the factors set forth in 18 U.S.C. § 3553(a),
impose a sentence of probation. Moreover, Paradiso submits that for purposes of the Court's
departure analysis under the guidelines and a variance analysis under 18 U.S.C. § 3553(a), the
factors below should be considered in isolation and in combination. See U.S.S.G. § 5K2.0,
Commentary (noting that a combination of offender characteristic or other circumstances may be
grounds for a departure even though none of the characteristics or circumstances individually
takes the case out of the "heartland."); see also United States v. Lombard, 72 F.3d 170, 183-84
(1st Cir. 1995).

A.    The Total Dollar Loss Attributable To Paradiso Significanlty Overstates The
      Seriousness Of His Conduct And Justifies A Substantial Downward Departure.

The victim loss table set forth in U.S.S.G. § 2F1.1(b)(1) presumes that the defendant
alone is responsible for the entire amount of victim loss specified in the particular loss range

selected by the sentencing court.  See United States v. Shattuck, 961 F.2d 1012, 1016 (1st Cir.1992) (quoting United States v. Gregorio, 956 F.2d 341, 347 (1st Cir.1992)).  U.S.S.G. § 2F1.1, Application Note 8(b) provides that where the loss determined under U.S.S.G. § 2F1.1(b)(1) significantly overstates the seriousness of a defendant's conduct, a downward departure may be warranted.  Paradiso submits that a downward departure is warranted here for three reasons.  First, the losses resulting from the loans in which he personally participated were not caused solely by his misrepresentations.  Rather, as noted above, the loans would not have been approved without misrepresentations by others and submission of additional false financial documents.  Thus, a departure is warranted on this basis.  See United States v. Gregorio, 956 F.2d 341, 345 (1st Cir. 1992)(departure granted on the ground that defendant's misrepresentations were not the sole cause of the victim loss affirmed).

Second, Paradiso realized only a small portion of the overall gain in this case.  See U.S.S.G. § 2F1.1, Application Note 9 (recognizing that an offender's gain is an alternative estimate of victim loss).  Indeed, as noted above, the approximate $37,000 he received was two-thousandths percent (.002%) of the more than $15 million total loss.  The loss table assigns an increase of 4 levels for a loss that is more than $20,000 and less than $40,000, or an increase that is 8 levels below the loss level assigned in the PSR (12 levels).  Thus, a departure is warranted on this basis as well.  See United States v. Oakford Corporation, 79 F.Supp.2d 357, 368 (S.D.N.Y. 2000)(13-level departure granted where defendant personally realized only a small portion of the overall $15 million dollar gain).

Third, although Paradiso's role in the overall conspiracy was somewhere between minor and minimal, the breadth of the conspiracy subjects Paradiso to a number of enhancements that substantially overlap.  Specifically, most large-scale fraud schemes involve careful planning,

sophisticated techniques or are otherwise extensive.  However, a phenomenon of the advisory guidelines, graphically illustrated by this case, is that Paradiso's sentencing range has been substantially increased by a series of enhancements including defrauding more than one victim; sophisticated means; and aggravating role in the offense.  Where the amount of loss will, by definition, cause multiple overlapping enhancements, the courts have held that a downward departure is authorized.  See United States v. Gigante, 94 F.3d 53, 56 (2d Cir. 1996)(downward departure authorized where substantially enhanced sentence range results from a series of enhancements proven only by a preponderance of the evidence); United States v. Jackson, 362 F.3d 160, 167-68 (2d Cir. 2004), *rev'd for further proceedings*, 543 U.S. 1097, 125 S.Ct. 1109 (2005) (multiple overlapping enhancements can justify a downward departure); United States v. Lauerson, 362 F.3d 160, 167-68 (2nd Cir. 2003) *rev'd for further proceedings*, 543 U.S. 1097, 125 S.Ct. 1109 (2005) (same).  Thus, a departure can be justified on this basis as well.

      B.     Paradiso's Exceptional Employment History And Naiveté In Committing  The Offenses In This Case Demonstrates That His Conduct Was An Aberration That Justifies A Substantial Departure.

Paradiso's exceptional employment history, while ordinarily a discouraged factor, see U.S.S.G § 5H1.5, is another basis for this Court to depart downward.  See  United States v. Higgins, 967 F.2d 841, 846 (3rd Cir. 1992)(stable employment, if extraordinary will justify departure); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991)(long-standing employment at two jobs).

Moreover, Paradiso's steady employment further demonstrates that his conduct, while not technically aberrant under the advisory guidelines, was clearly aberrational when viewed through the lens of Paradiso's entire life.  Indeed, prior to meeting Maggio, Paradiso was a hard-working law-abiding citizen and, after breaking off contact with Maggio in July 2000, he returned to this

stable life. In addition, subsequently he has married and is helping his wife raise and support her teenage son. Finally, he would be working today but for the fact that he is recovering from a work-related injury.

Finally, Paradiso's naiveté in committing the offenses in this case can also be considered by the Court. Indeed, Paradiso was not the typical straw borrower in this case. Rather, Paradiso atypically allowed Maggio to control every aspect of Earth including signing blank checks that Maggio used for various purposes. Paradiso's naiveté also made him particularly vulnerable to Maggio. Paradiso's naiveté combined with his exceptional employment record is a further reason to allow a substantial departure in this case. See United States v. Jagmohan, 909 F.2d 61, 65 (2nd Cir. 1990)(district court's downward departure based on defendant's solid employment record and naiveté in committing offense affirmed).

C.    Paradiso's Current Family Responsibilities Justifies A Substantial Departure.

Finally, Paradiso's current family responsibilities and the impact his incarceration would have on is family is yet another ground upon which the Court can justify a downward departure. See United States v. Rivera, 994 F.2d 942, 953-954 (1st Cir. 1993)(court has discretion to depart where family circumstances are unusual or out of the ordinary). Presently, Paradiso is providing care on a daily basis to his father while searching for a new home that he can afford and that is large enough to accommodate his father's medical needs. As noted in Dr. Moschitto's letter, Paradiso's father requires help with his diabetes including administering insulin injections, monitoring his blood sugar and diet, and taking multiple medications. Since Paradiso is Angelo Fenno's only son, the responsibility has fallen to him. There is no one else. See United States v. Johnson, 964 F.2d 124 (2d Cir. 1992)(departure granted to defendant with sole responsibility for raising four young children); Alba, supra at 1122 (departure granted to defendant who lived with

disabled, dependent father and grandmother).

In summary, Paradiso submits that the above factors, when taken together, make this case an exceptional one that warrants a departure or a variance to the extent necessary to impose a sentence of probation.

WHEREFORE, Mr. Paradiso respectfully requests the Court to impose a sentence of probation with any additional conditions the Court deems necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

<div style="margin-left:40%">

Respectfully submitted
By Defendant,
LOUIS A. PARADISO
By his attorney,


  /s/ Scott P. Lopez
Scott P. Lopez
Law Office of Scott P. Lopez
24 School Street, 8th Floor
Boston, MA  02108
(617) 742-5700

</div>

Dated:  October 6, 2006


<div style="text-align:center">

CERTIFICATE OF SERVICE

</div>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 6, 2006.

<div style="margin-left:40%">

  /s/ Scott P. Lopez
Scott P. Lopez

</div>